MOHAWK PETROLEUM COMPANY, PETITIONER, ET AL.[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.*

Docket Nos. 105967, 105968, 105969, 105970, 105971.

Promulgated October 30, 1942.

---

[1] Proceedings of the following petitioners are consolidated herewith: Alfred L. Marsten, Jr.; Lewis A. Marsten; Edwin V. McKenzie; and Estate of Alfred L. Marsten, Deceased, Edwin V. McKenzie, Executor.

* Prior to October 22, 1942, this report was approved for promulgation.

*Fred H. Brown, C. P. A.*, for the petitioners.
*T. M. Mather, Esq.*, for the respondent.

OPINION.

ARNOLD: These consolidated proceedings involve deficiencies in income taxes determined by the respondent against petitioner Mohawk Petroleum Co. for the fiscal years ended September 30, 1936 and 1937, in the amounts of $991.84 and $15,603.44, respectively.

The petitioners in Docket Nos. 105968, 105969, 105970, and 105971 are admittedly transferees of the assets of the Mohawk Petroleum Co. and liable, as such transferees, for any deficiencies determined against the Mohawk Petroleum Co. herein, together with interest thereon as provided by law.

The question involved is whether the Mohawk Petroleum Co., hereinafter referred to as petitioner, is entitled to loss deductions in the amounts of $5,044.13 and $35,026.52 claimed to have been sustained by it through the abandonment of oil well equipment in the fiscal years ended September 30, 1936, and September 30, 1937, respectively.

The facts were stipulated.

The petitioner was in the taxable years a California corporation and filed its returns with the collector of internal revenue for the first district of California. The petitioner has consistently closed its books and filed its income tax returns on the basis of a fiscal year ending September 30.

The petitioner acquired certain oil and gas leases upon lands in the Fruitvale Oil Field in Kern County, California, shortly after its organization in 1928. One of the leases so acquired was called the Red Ribbon Ranch lease. At the time of the acquisition of this lease there was a producing oil well located thereon. Five additional wells were drilled on the Red Ribbon Ranch lease by petitioner in 1929, 1930, and 1931 and all of the five wells became producing wells. All of the six wells located on the Red Ribbon Ranch lease continued to produce crude oil until during the fiscal year ended September 30, 1934, when one well became nonproductive. This well, petitioner's Red Ribbon Ranch lease well No. 6, was finally abandoned in the fiscal year ended September 30, 1936. The other five wells located on the Red Ribbon Ranch lease continued to produce crude oil for several years after the year ended September 30, 1936.

On December 12, 1932, the petitioner entered into an oil and gas lease with E. B. and Frona McKeehan covering certain lands in the Weedpatch Oil Field in Kern County, California. During the fiscal year ended September 30, 1934, two producing oil wells were drilled on the McKeehan lease and during the fiscal year ended September

30, 1936, one producing oil well was drilled thereon. During the fiscal year ended September 30, 1937, wells Nos. 1 and 3 on the McKeehan lease became nonproductive and were abandoned. Well No. 2 on such lease continued to produce for several years after the fiscal year ended September 30, 1937.

On March 17, 1936, the petitioner entered into an oil and gas lease with the Earl Fruit Co., a corporation, covering certain lands in Kern County, California. During the fiscal year ended September 30, 1936, one oil well was completed on the Earl Fruit Co. lease and during the fiscal year ended September 30, 1937, two additional wells were completed on that lease. Earl Fruit Co. lease well No. 1 started production of crude oil in August 1936 and become nonproductive in May 1937 and was abandoned prior to September 30, 1937. Well No. 2 on the Earl Fruit Co. lease was completed in January 1937, but it was not a commercially productive well and was abandoned shortly after completion and the capitalized cost of the well was written off as a dry hole loss and allowed as such by the respondent in the fiscal year ended September 30, 1937. Earl Fruit Co. lease well No. 3 was completed in March 1937 and produced crude oil for several years after its completion. Two additional producing wells were later completed on this lease.

Ever since its organization in 1928 petitioner has consistently deducted intangible development costs in connection with drilling oil wells as expense and has capitalized the cost of tangible oil well equipment. The cost so capitalized of each well was set up separately in the petitioner's books. The cost so capitalized applicable to the wells here in question is as follows:

| | |
|---|---|
| Red Ribbon Ranch lease well No. 6 | $9, 093. 60 |
| McKeehan lease well No. 1 | 22, 304. 17 |
| McKeehan lease well No. 3 | 16, 542. 36 |
| Earl Fruit Co. lease well No. 1 | 15, 735. 91 |

Ever since its organization in 1928 petitioner has consistently computed depreciation on the so-called unit of production method, that is to say, the annual depreciation applicable to the capitalized cost of oil well equipment located on a particular lease was determined by dividing the capitalized cost (after a 10 percent reduction for estimated salvage value) of all the wells on a particular lease by the estimated net potential crude oil production of the lease and the unit cost per barrel thus determined was then multiplied by the net number of barrels produced during the year from that particular lease to arrive at the amount of depreciation for the year. Estimated oil reserves and resulting unit cost per barrel were for an entire lease and the estimate was based upon the aggregate potential production of all wells and no separate determination of unit cost as to each separate well was made.

The depreciation reserve account in the petitioner's general ledger relating to depreciation on the capitalized cost of its oil wells is segregated as between the depreciation applicable to each separate oil lease, but is not segregated as between each separate oil well located on a particular lease.

Ever since its organization in 1928 petitioner has maintained a record of the crude oil production of each separate oil well.

During the fiscal year ended September 30, 1936, petitioner wrote off as a loss consequent to the abandonment of its Red Ribbon well No. 6 in that year an amount of $5,044.13, which said amount was computed as follows:

Total cost of tangible equipment capitalized_____ $9,093.60
Less depreciation previously written off:

| Year ended | Net bbls. produced after royalty to Lessor-Red Ribbon Well No. 6 | Unit depreciation rate applicable to Red Ribbon Ranch Lease Well Equipment | Amount |
|---|---|---|---|
| Sept. 30, 1930_____ | 12,421 | $.032068392 | $405.77 |
| Sept. 30, 1931_____ | 22,876 | .032068392 | 747.32 |
| Sept. 30, 1932_____ | 41,285 | .032971291 | 1,361.22 |
| Sept. 30, 1933_____ | 37,847 | .032920749 | 1,245.95 |
| Sept. 30, 1934_____ | 8,785 | .032920749 | 289.21 |
| Sept. 30, 1935_____ | None | _____ | None |
| Sept. 30, 1936_____ | None | _____ | None |

Total_____ $4,049.47

Abandonment Loss_____ $5,044.13

During the fiscal year ended September 30, 1937, petitioner wrote off as losses consequent to the abandonment of its McKeehan wells Nos. 1 and 3 and its Earl Fruit Co. well No. 1 a total amount of $35,026.52, which amount was computed as follows:

### Loss on McKeehan Well No. 1

Total cost of tangible equipment capitalized_____ $22,304.17
Less depreciation previously written off:

| Year ended | Net bbls. produced after Royalty to Lessor-McKeehan Well No. 1 | Unit depreciation rate applicable to McKeehan Lease Well Equipment | Amount |
|---|---|---|---|
| Sept. 30, 1934_____ | 105,426 | $.043556776 | $4,592.02 |
| Sept. 30, 1935_____ | 114,161 | .063458951 | 7,244.54 |
| Sept. 30, 1936_____ | 40,122 | .063458951 | 2,546.10 |
| Sept. 30, 1937_____ | 8,300 | .063458951 | 526.71 |

Total_____ $14,909.37

Loss on McKeehan Well No. 1_____ $7,394.80

### Loss on McKeehan Well No. 3.

| | | |
|---|---|---:|
| Total cost of tangible equipment capitalized | | $16,542.36 |
| Less salvage value of tangible equipment removed from well | | 1,479.75 |
| | | |
| Balance of equipment abandoned | | $15,062.61 |
| Less depreciation previously written off: | | |

| Year ended | Net bbls. produced after royalty to Lessor-McKeehan Well No. 3 | Unit depreciation rate applicable to McKeehan Lease Well Equipment | Amount |
|---|---|---|---:|
| Sept. 30, 1935 | 9,218 | $.063458951 | $584.96 |
| Sept. 30, 1936 | 5,938 | .063458951 | 376.92 |
| Sept. 30, 1937 | None | | |
| | | | |
| Total | | | $961.88 |
| | | | |
| Loss on McKeehan Well No. 3 | | | $14,100.73 |

### Loss on Earl Fruit Company Well No. 1.

| | | |
|---|---|---:|
| Total cost of tangible equipment capitalized | | $15,735.91 |
| Less salvage value of tangible equipment removed from well | | 2,204.92 |
| | | |
| Balance | | $13,530.99 |
| Depreciation previously written off | | None |

Petitioner did not adjust the cost of well equipment on account of depreciation in its computation of loss on the abandonment of the Earl Fruit Co. lease well No. 1 because at the time of closing its books for the fiscal year ended September 30, 1936, it had no reliable engineering reports as to the possible potential crude oil production from this lease and accordingly had insufficient data to compute depreciation with respect to the lease for the year and did not compute any depreciation in its books nor claim any depreciation in its income tax return with respect to the lease for the year. Respondent computed and allowed depreciation applicable to the well equipment located on the Earl Fruit Co. lease for the year ended September 30, 1936, as follows:

| | Total cost of tangible equipment | Less estimated salvage 10% | Balance subject to depreciation | Unit cost (per bbl.)* | Net production after royalty to lessor | Depreciation |
|---|---|---|---|---|---|---|
| | | | | | Bbls. | |
| Well No. 1 | $15,735.91 | $1,573.59 | $14,162.32 | | 2,884.00 | |
| Well No. 2 | 4,003.29 | ·400.33 | 3,602.96 | | None | |
| Total | 19,739.20 | 1,973.92 | 17,765.28 | $0.1188687 | 2,884.00 | $342.82 |

*Based on total net potential production (after deduction of royalty to lessor) of 149,453 barrels of crude oil.

In his final determination of tax for the fiscal year ended September 30, 1936, the respondent disallowed the claimed deduction of $5,044.13 consequent to the abandonment of petitioner's Red Ribbon Ranch

lease well No. 6 and similarly disallowed during the fiscal year ended September 30, 1937, claimed deductions totaling $35,026.52 consequent to the abandonment of petitioner's McKeehan lease wells Nos. 1 and 3 and Earl Fruit Co. lease well No. 1, for the following reasons:

(b) On your return your claimed the deduction of $5,044.13 in the fiscal year ended September 30, 1936 (and $35,026.52 in the fiscal year ended September 30, 1937) as a loss sustained through the abandonment of oil well equipment at oil wells shut down during the taxable year although other wells on the same leaseholds continued to operate.

You elected and have continued to deduct depreciation on your oil well equipment on your income tax returns on a unit of production basis based upon the total estimated production of oil to be obtained from an entire leasehold.

Since your tangible oil well equipment installations on each leasehold in question consist of more than one installation and depreciation has been based upon the average lives of all such installations, losses claimed on the normal retirements of such assets are not allowable inasmuch as an average rate contemplates a normal retirement of assets both before and after the average life has been reached and there is therefore, no possibility of ascertaining any actual loss under such circumstances until all assets contained in the group have been retired or disposed of.

Therefore the losses claimed in the respective years are disallowed as deductions. See Article 23 (e)–3, Regulations 94 and 101.

Article 23 (e)–3 of Regulations 94 and 101, in so far as pertinent herein, is set forth in the margin.[2]

The petitioner contends that the unit of production method used by it in determining depreciation on its oil well equipment contemplated that the lives of the oil wells on a particular lease would be the same, i. e., as long as the lease on which such wells are located was commercially productive, and that the abandonment of any well and the retirement of its equipment prior to the time the lease becomes com-

---

[2] ART. 23 (e)–3. *Loss of useful value.—* * * *

If the depreciable assets of a taxpayer consist of more than one item and depreciation, whether in respect of items or groups of items, is based upon the average lives of such assets, losses claimed on the normal retirement of such assets are not allowable inasmuch as the use of an average rate contemplates a normal retirement of assets both before and after the average life has been reached and there is, therefore, no possibility of ascertaining any actual loss under such circumstances until all assets contained in the group have been retired. In order to account properly for such retirement the entire cost or other basis of assets retired, adjusted for salvage, will be charged to the depreciation reserve account, which will enable the full cost or other basis of the property to be recovered.

In cases in which depreciable property is disposed of due to causes other than exhaustion, wear and tear, and normal obsolescence, such as casualty, obsolescence other than normal, or sale, a deduction for the difference between the basis of the property (adjusted as provided in section 113 (b) and articles 113 (a) (14)–1, 113 (b)–1, 113 (b)–2, and 113 (b)–3) and its salvage value and/or amount realized upon its disposition may be allowed subject to the limitations provided in the Act upon deduction for losses, but only if it is clearly evident that such disposition was not contemplated in the rate of depreciation.

In the case of classified accounts, if it is the consistent practice of the taxpayer to base the rate of depreciation on the expected life of the longest lived asset contained in the account, or in the case of single item accounts if the rate of depreciation is based on the maximum expected life of the asset, a deduction for the basis of the asset (adjusted as provided in section 113 (b) and articles 113 (a) (14)–1, 113 (b)–1, 113 (b)–2, and 113 (b)–3) less its salvage value is allowable upon its retirement. * * *

mercially nonproductive are premature and hence abnormal. The petitioner also contends that, since the method used by it was not based upon the average life of the individual well upon a given lease but upon the life of the lease, which is coextensive with the longest life of any well located on such lease, the losses claimed are allowable under the provisions of the last paragraph of article 23 (e)-3. (See note 1.)

The fallacy of petitioner's argument lies in the fact that it presupposes the life of the tangible equipment of a well to be coextensive with the life of the lease or so long as the lease on which the wells are located is productive. It is common knowledge that some wells produce salt water and other deleterious substances that eat out the casing, tubing, rods, lead lines, and other equipment, necessitating replacements of tangible equipment during the productive life of such wells. On the other hand equipment in some wells may still have considerable useful life after a well becomes nonproductive. The fact that a well becomes nonproductive and is abandoned does not necessarily result in the complete loss of usefulness of the equipment thereon or accelerate its depreciation or constitute abnormal retirement of the equipment. Such equipment may be and often is used at other wells. The stipulation shows that the wells involved were abandoned, but there is no evidence showing that the equipment thereon was also abandoned because it had lost its usefulness or that the abandonment of the wells caused depreciation of the equipment in excess of that normally sustained. Except that the stipulation shows that petitioner "wrote off" the amounts of $5,044.13 and $35,026.52 "as losses consequent to the abandonment of its" wells and claimed losses in its income tax returns in such amounts, there is no evidence that the equipment was actually retired or abandoned because it had lost its economic usefulness and had no more than scrap or salvage value or no value.

The method used by petitioner contemplates the recovery of the entire cost of the equipment over the productive life of the lease. This method contemplates a normal retirement of the equipment, both before and after the average life has been reached. In the absence of a sale of the equipment for which the loss is claimed, or unusual or abnormal circumstances which result in its destruction, obsolescence, or accelerated depreciation, no retirement loss is allowable so long as the lease continues to produce and other equipment on the same lease is in use.

What was said in *U. S. Industrial Alcohol Co.*, 42 B. T. A. 1323, 1378–1379 (appeal pending, C. C. A., 2d Cir.), is equally applicable herein:

The principle to be applied to a composite rate in such a case as this, therefore, is that assets which are retired at the end of their normal life can not be permitted to furnish further compensation by way of a deduction for loss on retirement, even though they may be retired in advance of the average life of the entire

group. Their early retirement will be compensated for by depreciation taken after the average period has passed.

What has been said, however, applies only to normal retirements; and the converse of the statement is also true. If assets are removed from the group as a result of abnormal retirements resulting from unanticipated causes occurring before the end of the normal life attributed to such assets in arriving at the composite rate, the resulting·loss is the proper ground for a deduction. Such losses are not to be compensated for by way of depreciation. *Southland Coal Co.*, 16 B. T. A. 50, and if not permitted as deductions will prevent the final recovery of the entire original cost.

It was stipulated that well No. 6, Red Ribbon Ranch lease, was abandoned in the year ended September 30, 1936, and that wells Nos. 1 and 3, McKeehan lease, and well No. 1, Earl Fruit Co. lease, were abandoned in the year ended September 30, 1937, for the reason that such wells became nonproductive and that the petitioner wrote off as losses the respective amounts herein claimed. It is not the well which is subject to depreciation, but it is the equipment used in connection with the production of oil which is the subject of depreciation. The life of the well does not determine the life of the equipment. There is no evidence that the equipment had outlived its usefulness or that the retirement of the equipment was necessitated by unusual or abnormal circumstances. The evidence shows that well No. 6 produced a total of 123,214 barrels of oil. This is less than the average estimated oil reserve of the Red Ribbon Ranch lease. Such a showing, however, does not entitle petitioner to the deduction of a retirement loss under the circumstances shown herein. See *Acme Manifolding Co.*, 24 B. T. A. 429, and *U. S. Industrial Alcohol Co., supra.*

The petitioner argues that it ought to be permitted to deduct the losses claimed because it kept records of the capitalized·cost of equipment and the production of each well. However, in determining the depreciation allowable in years prior to the abandonment of the well for the purpose of computing the loss sustained the petitioner multiplied the annual production by the rate used in determining the depreciation allowance on the lease on which the well was located. As heretofore stated, such rate was based on the estimated oil reserve of the entire lease and the capitalized cost of all the oil well equipment on such lease, less 10 percent for salvage. The evidence fails to show the estimated oil reserve for any of the wells abandoned. Not having the estimated oil reserve of the individual wells, it is impossible to determine the rate of depreciation applicable to the equipment of each well on the unit of production basis, even though the cost of the equipment and production of each well is shown.

Respondent in his determination allowed the loss claimed on well No. 2, Earl Fruit Co. lease, and there is no dispute as to that item. Well No. 1 on that lease produced oil, and although for a comparatively short time, under petitioner's unit of production method for

determining depreciation on well equipment there is no reason why the equipment in connection with this well should be treated differently from that of wells abandoned on leases while other wells on the same lease continued to produce, since the Earl Fruit lease continued to produce after well No. 1 thereon was abandoned. The fact that petitioner had not determined the estimated oil reserve of such lease at the time of closing its books for the fiscal year ended September 30, 1936, and did not deduct any depreciation is immaterial. From the stipulation it appears that the oil reserve was later determined and in computing petitioner's tax liability for the year ended September 30, 1936, the respondent allowed depreciation on the unit of production basis employed by petitioner.

The petitioner relies in particular upon the case of *Witherspoon Oil Co.*, 34 B. T. A. 1130, claiming that the precise question here involved was presented therein. A reference to the record of that case discloses that the issues raised involved only an alleged partnership loss and disallowance of "undepleted cost." The Board approved the action of the respondent as to these two issues. The decision entered therein was for the amounts of the deficiencies in taxes claimed by the respondent, no allowance being made upon recomputation of the deficiency under Rule 50 for any undepreciated costs of physical assets. Apparently the depreciation deductions allowed by the respondent in that case were not questioned.

*Decisions will be entered for the respondent.*